IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

DANIEL FLEMMING,

    Plaintiff,

v.                                                            CASE NO. 1:13-cv-150-MP-GRJ

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

    Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiff appeals to this Court from a final decision of the Commissioner of Social Security (the "Commissioner") denying his application for disability insurance benefits and supplemental security income ("SSI"). (Doc. 1). The Commissioner has answered (Doc. 12), and both parties have filed briefs outlining their respective positions. (Docs. 16, 17.) For the reasons discussed below, the Commissioner's decision is due to be **AFFIRMED**.

## I. PROCEDURAL HISTORY

Plaintiff filed applications for disability insurance benefits and SSI in November 2010, alleging disability beginning January 2010. (R. 18, 225-30.) Plaintiff's applications were denied initially and upon reconsideration. (R. 132-33.) An administrative hearing was held before an Administrative Law Judge ("ALJ") on April 3, 2012. (R. 69-108.) On May 17, 2012, the ALJ issued a written decision finding that Plaintiff was not disabled. (R. 18-30.) The Appeals Council denied Plaintiff's request for review on March 29, 2012. (R. 1-4.) This action followed.

## II.  **STANDARD OF REVIEW**

The Commissioner's findings of fact are conclusive if supported by substantial evidence.[1] Substantial evidence is more than a scintilla, i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.[2]

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.[3] The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[4] However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.[5]

The law defines disability as the inability to do any substantial gainful activity by

---

[1] *See* 42 U.S.C. § 405(g) (2000).

[2] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982) and Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); *accord,* Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[3] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[4] Foote, 67 F.3d at 1560; *accord,* Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

[5] Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[6]  The impairment must be severe, making Plaintiff unable to do his previous work, or any other substantial gainful activity which exists in the national economy.[7]

The ALJ must follow five steps in evaluating a claim of disability.[8]  First, if a claimant is working at a substantial gainful activity, he is not disabled.[9]  Second, if a claimant does not have any impairment or combination of impairments which significantly limit his physical or mental ability to do basic work activities, then he does not have a severe impairment and is not disabled.[10]  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, he is disabled.[11]  Fourth, if a claimant's impairments do not prevent him from doing past relevant work, he is not disabled.[12]  Fifth, if a claimant's impairments (considering his residual functional capacity ("RFC"), age, education, and past work) prevent him from

---

[6] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505 (2005) (All further references to 20 C.F.R. will be to the 2005 version unless otherwise specified.).

[7] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[8] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[9] 20 C.F.R. § 404.1520(b).

[10] 20 C.F.R. § 404.1520(c).

[11] 20 C.F.R. § 404.1520(d).

[12] 20 C.F.R. § 404.1520(e).

doing other work that exists in the national economy, then he is disabled.[13]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[14]  The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy.[15]  The Commissioner may satisfy this burden by pointing to the Medical-Vocational Guidelines (the "Grids") for a conclusive determination that a claimant is disabled or not disabled.[16]

However, the ALJ should not exclusively rely on the Grids when "the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion."[17]  In a situation where both exertional and non-exertional impairments are found, the ALJ is obligated to make specific findings as to whether they preclude a wide

---

[13] 20 C.F.R. § 404.1520(f).

[14] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987); *see also* Doughty v. Apfel, 245 F. 3d 1274, 1278 (11th Cir. 2001).

[15] Doughty, 245 F.3d at 1278 n.2. In Doughty the court explained this burden shifting as follows:

In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform.  In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.) (Internal citations omitted).

[16] Walker, 826 F.2d at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.").

[17] Wolfe v. Chater, 86 F.3d 1072, 1077 (11th Cir. 1996). See Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Walker, 826 F.2d at 1003 ("The grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation.").

range of employment.[18]

The ALJ may use the Grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[19] Such independent evidence may be introduced by a Vocational Expert's ("VE") testimony, but this is not the exclusive means of introducing such evidence.[20] Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.

### III.  SUMMARY OF THE RECORD

#### A.  Medical History

In January 2010, Plaintiff presented to the emergency room complaining of forehead and nose pain after losing his balance while being arrested and falling, hitting his face on a truck. (R. 310.) Neurological examination was negative, and psychiatric findings were normal. (R. 310-11, 314.) Plaintiff was diagnosed with forehead and facial lacerations. (R. 311.)

Plaintiff returned to the emergency room on February 24, 2010, this time complaining of chest pain, telling doctors that he had methamphetamine growing inside of him. (R. 463.) Plaintiff had psychiatric symptoms of moderate intensity and was diagnosed with drug abuse; psychosis, severe acute exacerbation; tobacco abuse; and

---

[18] Walker, 826 F.2d at 1003.

[19] Wolfe, 86 F.3d at 1077-78.

[20] *See id.*

chest pain. (R. 467.) Plaintiff admitted to current use of methamphetamine, and laboratory tests confirmed marijuana use. (R. 466-67.) It was recommended that Plaintiff be involuntarily committed to due to acute psychosis secondary to drug use. (R. 464.) Accordingly, Plaintiff was sent to Moccasin Bend Mental Health Institute on February 26, 2010, with a chief complaint of doing a hit of methamphetamine and going crazy. He was diagnosed with substance-induced anxiety disorder. (R. 395.)

Treatment notes at Moccasin Bend indicate that Plaintiff had no prior history of psychiatric treatment. (R. 397.) He was cooperative, interacted appropriately with staff and patients, and "at no time was his behavior bizarre." Plaintiff denied hallucinations and none were evident. (R. 395.) On mental status examination, Plaintiff exhibited average intellect, anxious mood and affect, goal directed thought, fair insight and judgment, intact memory, and was intact cognitively. (R. 398.) Plaintiff was not admitted to Moccasin Bend because he did not meet the criteria for either psychotic or mood disorder diagnosis and he was no longer dangerous to himself or others Plaintiff was sent home with recommendations that he seek outpatient drug/alcohol treatment and counseling at the community mental health center. (R. 400.)

Plaintiff returned to Moccasin Bend in November 2010, this time admitted for six days upon referral from the county jail system. The notes indicate that Plaintiff reported no other inpatient or outpatient treatment, and his chief complaint was that he violated his parole. Plaintiff reported previous head injuries and symptoms of aggression and forgetfulness. He was confused easily. (R. 316.) His discharge diagnoses were mood disorder, dementia, and personality change due to head trauma. (R. 317.) Plaintiff was

prescribed Depakote, Vistaril, Citalopam, and Trazodone. (R. 318.)

On December 23, 2010, Plaintiff returned to Moccasin Bend via law enforcement after hitting his mother. Plaintiff was waving a logging chain to "ward off evil," appeared dirty and unkempt, and appeared to have psychomotor agitation. (R. 321.) Plaintiff reported that since he was discharged from his previous admission to Moccasin Bend in November 2010, he had not done any follow up and had not taken his medication. (R. 324.) By January 4, 2011, treatment notes reflect that Plaintiff had not had any aggressive or threatening behavior and had improved regarding following rules. (R. 357.) An updated psychiatric evaluation on February 28, 2011 indicated that Plaintiff's mother had been appointed as his conservator. His general mood was pleasant and cooperative, but he was randomly oppositional. Placement at a specialized facility for individuals with brain injuries was recommended. (R. 329.) An April 5, 2011 treatment note indicated that Plaintiff had not been fully compliant in taking his medications at the hospital. (R. 370.) Plaintiff was discharged from Moccasin Bend on May 2, 2011, with a prognosis of "fair with compliance." (R. 405.)

The same day of his discharge from Moccasin Bend, May 2, 2011, Plaintiff entered 21st Century Living/Day/Rehab Services in Gallatin, Tennessee, to work on improving his speech, memory, and impulsivity. Intake notes indicated a brain injury due to assault in January 2010, brain injury due to a motorcycle accident in 2004, and a steel plate inserted into his head in 1999. Plaintiff left the facility on June 29, 2011 to live with his mother. While at 21st Century, Plaintiff did well overall but about two weeks prior to his exit had an incident where he purchased synthetic marijuana and smoked it

in a car while his family was inside a restaurant.  Upon leaving the facility, Plaintiff "was still talking about doing drugs upon leaving."  Plaintiff participated in speech therapy during his stay, and "did very well."  (R. 407-08.)  Plaintiff attended a structured day program and did not have any problems at the group home where he stayed during the evenings and on weekends.  He helped with cleaning, his hygiene was good, he participated in all activities, and was helpful, with only one behavior episode since admission, but was easily redirected.  (R. 426.)

In February 2012, Plaintiff was evaluated at Moccasin Bend after law enforcement took him to the emergency room.  Plaintiff was non-compliant with his medications; his lab tests were positive for marijuana.  (R. 432-38.)  Plaintiff, who had apparently moved to Florida by this time, was instructed to follow up at the University of Florida College of Medicine in Gainesville, Florida.  (R. 433.)

In April 2012, Plaintiff was admitted to Meridian Behavioral Healthcare in Gainesville because he was "refusing to take medication (Depakote, Fluphenzaine, Divalproex, and Benztropine).  Hallucinating and throwing punches into the air and said he was fighting with the devil."   Law enforcement found Plaintiff and involuntarily committed for treatment.  Plaintiff's mother reported that Plaintiff's issues began in January 2010 when he was assaulted and hit his head on the pavement.  She reported that he had been doing really well until two weeks prior and that when he is compliant with taking his medication he was the person she knew before the 2010 injury.   She also reported that Plaintiff's doctor in Tennessee told him that it would be better for him to smoke marijuana than take pain medication.  A provisional diagnosis of

schizophrenia was given. (R. 498.) Upon discharge on April 29, 2012, Plaintiff was prescribed Depakote and Risperdal and diagnosed with psychotic disorder and mood disorder, not otherwise specified. (R. 490.)

**B.     Hearing Testimony**

Plaintiff testified that is incapable of working because he has social anxiety. (R. 89.) He said he has never sought treatment because he did not know it existed and does not have insurance. (R. 90.) Plaintiff testified that he was treated at Moccasin Bend and 21st Century for his head injuries. He was not on any medication at the time of the hearing. (R. 92.) He testified that his neurologist told him that marijuana is helpful for head injuries. (R. 93.) He could not remember the neurologist's name. Plaintiff testified that he smokes marijuana for his headaches and had smoked a few days before the hearing. (R. 94-95.) He said that during the day he helps his mom clean the house and keeps himself occupied by smoking cigarettes, he has "no real notion of occupation" and therefore it is a very boring time in his life. (R. 95.) Plaintiff testified that he gets short-tempered a few times a month and has a very short attention span. (R. 97.)

Plaintiff's mother testified at the hearing that Plaintiff has not had outpatient mental health treatment because he does not have insurance. (R. 98.) She testified that her son cannot work because he does not recognize time span very well and gets easily frustrated and angry. She that when her son threatened her in the past (i.e., preceding his admission to Moccasin Bend), he was in "crisis mode" and that he still lives with her because he is her son and needs help. (R. 100.)

**C.      Findings of the ALJ**

The ALJ found that the Plaintiff had the severe impairments of personality disorder and historic traumatic brain injury, but neither of these severe impairments met or equaled a Listing.  Plaintiff had the residual functional capacity to perform medium work but needed "simple, routine, one to two step tasks with non-production pace" and "infrequent and superficial" contact with others. (R. 23.)   In her discussion of the medical records, the ALJ noted that Plaintiff has had no consistent mental health treatment; has not been on any medications; and that his psychotic behavior was self-induced due to Plaintiff's illegal drug use.  The ALJ also took administrative notice that Plaintiff did not suffer from a traumatic brain injury in 2010 but rather had lacerations on his head from a fall. (R. 24.)  The ALJ pointed out that although Plaintiff alleged he became disabled on January 1, 2010 (R. 227), he later reported that he had been fired from his longtime job as a river guide in on July 25, 2010.  The ALJ concluded that jobs existed in significant numbers in the national economy that Plaintiff could perform (i.e., hospital cleaner, kitchen helper, automobile detailer), and therefore Plaintiff was not disabled.  (R. 18-30.)

## IV. DISCUSSION

On appeal, Plaintiff argues that the ALJ erred in failing to consider all of Plaintiff's severe impairments at step two.  Specifically, Plaintiff contends that the ALJ erred by not finding that in addition to the severe impairments of personality disorder and historic traumatic brain injury, Plaintiff also had the severe impairment of psychosis.  Plaintiff argues that as a result of this error, the ALJ failed to properly consider the combined

Page 11

effects of all of Plaintiff's impairments.  (Doc. 16.)  For the reasons discussed below, the Court concludes that the ALJ properly considered all of Plaintiff's impairments in making a finding that Plaintiff was not disabled.

The Eleventh Circuit, as well as numerous other circuits, have held that step two of the sequential analysis may do no more than screen out de minimis claims.[21]  An impairment or combination of impairments is severe at step two of the sequential evaluation if it significantly limits a claimant's physical or mental ability to do basic work activities.[22]  To be considered "severe" a medical condition must constitute more than a "deviation from purely medical standards of bodily perfection or normality."[23]

The ALJ is not required to identify all of the impairments that should be considered severe.  *See Heatly v. Commissioner of Social Sec.,* 382 F. App'x 823 (11th Cir. 2010) (finding harmless error where the ALJ determined the claimant's only severe impairment was status-post cervical fusion, despite a separate diagnosis of back pain).  The only requirement at step two is to identify if any severe impairment exists.  *Id.* ("Nothing requires that the ALJ must identify, at step two, all of the impairments that should be considered severe.").  Here, the ALJ determined at step two that Plaintiff

---

[21] Stratton v. Bowen, 827 F.2d 1447, 1453 (11th Cir. 1987); see also Anthony v. Sullivan, 954 F.2d 289, 294-95 (5th Cir. 1992); Bailey v. Sullivan, 885 F.2d 52, 56-57 (3rd Cir. 1989).

[22] 20 C.F.R. § 404.1520(c).

[23] McCruter v. Bowen, 791 F.2d 1544, 1547 (11th Cir. 1986).

suffered from the severe impairments of personality disorder and historic traumatic brain injury, a finding sufficient to satisfy step two.[24]

It is also clear that the ALJ considered all of Plaintiff's impairments in combination, having discussed in detail Plaintiff's testimony and medical history, which includes his treatment records at Moccasin Ben and Meridian. The ALJ did not ignore Plaintiff's episodes of psychosis, but rather discussed these records in detail and found "that the evidence overwhelming supports that the claimant's psychotic behavior was self-induced and now he continues to self medicate." (R. 24.) The ALJ also noted that Plaintiff had no consistent mental health treatment during the relevant period and was non-compliant in taking his medications. Plaintiff was employed as a river guide for many years until he was fired in July 2010, several months after his alleged onset date of disability (*Id.*) Furthermore, records from 21st Century and reports from Plaintiff's mother evidence that when Plaintiff took his prescribed medication and refrained from substance abuse, he did not exhibit psychotic behavior. (R. 407-08, 498.) The severe impairments identified by the ALJ and accompanying symptoms take into account Plaintiff's diagnosis of psychosis. The ALJ discussed Plaintiff's limitations due to these symptoms, and the diagnoses documented by his medical records.

However, any error at step two was harmless, because the ALJ considered all of

---

[24] Jamison v. Bowen, 814 F.2d 585, 588 (11th Cir. 1987)("[w]hether or not it [the impairment] qualifies as a disability and whether or not it results from a single severe impairment ... is enough to satisfy the requirement of step two."); Maziarz v. Secretary of Health and Human Services, 837 F.2d 240, 244 (6th Cir. 1987).

Plaintiff's complaints and medical records–including those related to Plaintiff's psychotic episodes–in formulating his residual functional capacity.  The ALJ's mental RFC for Plaintiff took into account his mental impairments by limiting him to simple, routine, 1-2 step tasks with non-production pace and infrequent and superficial contact with others. (R. 22.)

Accordingly, based upon this record, the Court concludes that the ALJ did not err in her step two determination by not listing the additional severe impairment of psychosis, and did not fail to consider Plaintiff's impairments in combination.  The Court finds that the ALJ's determination is supported by substantial evidence, and therefore the decision of the Commissioner is due to be affirmed.

## V.  RECOMMENDATION

In view of the foregoing, it is respectfully **RECOMMENDED** that the decision of the Commissioner should be **AFFIRMED**.

**IN CHAMBERS** in Gainesville, Florida this 29th day of April 2014.

*s/ Gary R. Jones*
GARY R. JONES
United States Magistrate Judge

### NOTICE TO THE PARTIES

**Pursuant to Fed. R. Civ. P. 72(b)(2), a party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**